# FRIER LEVITT
ATTORNEYS AT LAW

Jonathan E. Levitt, Esq. (JL 3881)
William Lim, Esq. (WL 5706)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile:   (973) 618-0650
jlevitt@frierlevitt.com
wlim@frierlevitt.com

Attorneys for Plaintiff-Petitioner, Mohamed M. Kawam, M.D.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MOHAMED M. KAWAM, M.D.,<br><br>                Plaintiff-Petitioner,<br><br>        vs.<br><br>UNITED STATES OF AMERICA, THOMAS M. HARRIGAN, in his official capacity as Deputy Administrator of the Drug Enforcement Administration, ADRIANA DIMICELI, Special Agent – Drug Enforcement Administration, in her individual capacity, THOMAS POPOWICH, Diversion Investigator – Drug Enforcement Administration, in his individual capacity, THOMAS GERMANY, Special Agent – Drug Enforcement Administration, in his individual capacity, JOHN DOES 1 – 20, law enforcement officers, in their individual capacities,<br><br>                Defendants-Respondents. | Civil Action No.<br><br>Hon.<br><br>**VERIFIED COMPLAINT, JURY DEMAND, DESIGNATION OF TRIAL COUNSEL, AND LOCAL CIVIL RULE 11.2 CERTIFICATION**<br><br>(DEA Asset ID No. 14-DEA-602837, Case No. C3-13-0140)<br><br>(On Appeal From DEA Administrative Docket No. 2014-23) |

Plaintiff-Petitioner, Mohamed M. Kawam, M.D. ("Petitioner" or "Dr. Kawam"), by and through his attorneys, **FRIER & LEVITT, LLC**, and by way of Complaint against Defendants-Respondents, United States of America, Thomas M. Harrigan, in his official capacity as Deputy Administrator of the Drug Enforcement Administration, Adriana DiMiceli, Special Agent – Drug

Enforcement Administration, in her individual capacity, Thomas Popowich, Diversion Investigator – Drug Enforcement Administration, in his individual capacity, Thomas Germany, Special Agent – Drug Enforcement Administration, in his individual capacity, and John Does 1 – 20, law enforcement officers, in their individual capacities, alleges as follows:

## INTRODUCTION

1.      This is an action seeking judicial review of myriad violations of Petitioner's civil rights under 42 U.S.C. § 1983 and the Fourth and Fifth Amendments to the United States Constitution, arising out of an investigation, search, and seizure improperly conducted by the United States Drug Enforcement Administration ("DEA"), which has been compounded by further violations of Petitioner's rights to due process under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 et seq., and the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 et seq., arising out of the DEA's arbitrary and capricious administrative agency orders that were entered in furtherance of its improper investigation.

2.      This is also an action pursuant to 21 U.S.C. § 881 to contest the forfeiture of property seized by the DEA during its improper investigation, to wit: $52,874.00 in United States currency belonging to Petitioner.

3.      This is also an action for replevin seeking the return of all other property, apart from U.S. currency, seized by the DEA during its improper investigation, to wit: *original* business records of Petitioner's medical practice, and *original* patient files affecting over *one thousand* of Petitioner's patients.

4.      Upon information and belief, from in or about February 2014 through August 2014, the DEA, by and through Defendants DiMiceli, Popowich, Germany, and/or John Does 1 – 20, initiated, organized, implemented, supervised, and participated in an undercover investigation of Petitioner's medical practice, by which Defendants sought to obtain evidence of Petitioner's alleged

violation of the CSA.

5.      Upon information and belief, Defendant DiMiceli, in an undercover capacity, posed as a patient seeking medical treatment from Petitioner.

6.      Upon information and belief, at least one other DEA agent, in an undercover capacity, posed as a patient seeking medical treatment from Petitioner.  While Petitioner is at this time without knowledge as to this agent's actual name, Petitioner rendered medical treatment to this agent as patient "William Orlando."   For the purposes of this Complaint, Petitioner includes "William Orlando" among Defendants John Does 1 – 20, subject to identification.

7.      Over the course of six to seven months, Defendants DiMiceli and "Orlando" made regular monthly office visits to Petitioner's medical office, purportedly seeking legitimate treatment for pain and/or other conditions.

8.      Upon information and belief, Defendants DiMiceli and "Orlando" gave Petitioner false medical histories and/or fabricated medical records, including, but not limited to, MRI reports, in support of their presenting conditions.

9.      Believing in good faith the information provided by Defendants DiMiceli and "Orlando," and believing that Defendants DiMiceli's and Orlando's conditions constituted legitimate medical purposes for treatment, Petitioner, in the course of his professional practice, rendered legitimate medical treatment to both Defendants in accordance with the standards of professional medical practice, by *inter alia* performing physical examinations of both Defendants, and prescribing to both Defendants clinically appropriate, therapeutic dosages of medication, including Oxycodone and Alprazolam.

10.      Nevertheless, based on absolutely _no_ evidence of indiscriminate prescribing or unlawful diversion of Oxycodone, Alprazolam, or any other controlled dangerous substance ("CDS"), and absolutely _no_ evidence of unlawful income derived from the sale of CDS or CDS

prescriptions, the DEA ruthlessly proceeded with its investigation of Petitioner through a combination of legal misconduct, gross misrepresentation, wanton deceit, recklessness with deliberate indifference, and arbitrary and capricious deprivations of Petitioner's rights and property.

11. Specifically, based solely upon the word of Defendants DiMiceli and/or "Orlando," and without prior notice to Petitioner, on August 12, 2014, Defendant Harrigan issued an Order to Show Cause and Immediate Suspension of Registration, administratively suspending Petitioner's DEA registration to administer, dispense, and prescribe CDS. *Notably, the Order to Show Cause is addressed to Petitioner's business office.*

12. Contemporaneously, on August 11, 2014, based solely upon the affidavit of Defendant DiMiceli, the DEA sought and obtained a search warrant for *Petitioner's business office* from the U.S. District Court for the District of New Jersey.

13. Importantly, by its own terms, the search warrant is limited in location to "Dr. Mohamed Kawam's *business office* … at 160 Haledon Avenue, Prospect Park, New Jersey" (emphasis added).

14. Furthermore, by its own terms, the search warrant is limited in scope to: "1. Patient files for patients who are being prescribed drugs that are controlled substances listed on Schedules II, III, and IV pursuant to the Controlled Substances Act…" and "2. Records pertaining to office visits and payment, including appointment books, sign in sheets, day sheets, patient payment ledgers and records, and patient insurance documents." *Notably, neither cash money nor U.S. currency are listed among the items authorized to be seized.*

15. Despite the search warrant's clear parameters as being for Petitioner's *business office*, at approximately 8:00 a.m. on the morning of Wednesday, August 13, 2014, Defendants DiMiceli, Popowich, Germany, and/or John Does 1 – 20, conducted what can only be described as a "shock and awe" raid upon Petitioner's *home*, located in Wayne, New Jersey.

16.     Notably, Defendants appeared at Petitioner's home in wholly excessive and disproportionate force, arriving at a time clearly intended to catch Petitioner *and his family* off guard as they went about their usual morning routines, blocking the street in front of Petitioner's home with a fleet of approximately six window-tinted unmarked cars, and with at least ten armed law enforcement officers roaming throughout the home, authoritatively shouting at Petitioner and his family, while Petitioner and his wife were detained and interrogated separately in separate rooms *for nearly two hours*.

17.     More egregiously, although Defendants announced that they had a search warrant, at no time during the search of the home did Defendants provide to Petitioner a copy of the warrant, or otherwise reveal that the warrant was actually for Petitioner's *office* located in Prospect Park and *not his home* located in Wayne.

18.     Defendants' gross and material misrepresentation of their search warrant authority, coupled with their overwhelming show of force, effectively coerced Petitioner and caused him to believe that he had no choice but to acquiesce to every instruction given or risk being charged with obstructing justice or acting in contempt of court.

19.     Compounding Petitioner's sense of fear and shock, Petitioner, surrounded by gun-wielding authorities, was detained and restricted from leaving his kitchen, while he was interrogated by one or more of the Defendants.

20.     At the same time, Petitioner's wife was detained and restricted from leaving the master bedroom, while she was interrogated by one or more of the Defendants.

21.     Moreover, during Petitioner's detention and interrogation, at least one or more of the Defendants would make remarks to the effect that Petitioner's professional licenses would inevitably be revoked, or that Petitioner would face imprisonment, in a clear attempt to verbally intimidate Petitioner.

22.     Additionally, one or more Defendants also made several comments, and asked several questions, regarding Petitioner's Syrian descent and/or Petitioner's political beliefs about the conflict in Syria.

23.     Additionally, one or more Defendants asked Petitioner for the whereabouts of Petitioner's firearm, insinuating that Petitioner actually had a firearm, when such was clearly not the case.  Indeed, no firearms were found in Petitioner's home or office.

24.     Defendants had absolutely no probable cause, and indeed, no legal authority to search Petitioner's home, much less to detain and interrogate Petitioner and his wife.

25.     Indeed, nowhere in the recitation of supporting facts in the DEA's Order to Show Cause is there any mention of Petitioner allegedly conducting illegal activity or allegedly holding contraband at his home.

26.     Additionally, as Petitioner's home is more than five miles from his office, and as August 13, 2014 was an ordinary day on which Petitioner held office hours, Defendants had ample opportunity to serve the Order to Show Cause and execute the search warrant upon Petitioner at his business office in due course, without going anywhere near his home.

27.     Nevertheless, in clear violation of the search warrant, Defendants proceeded to ransack Petitioner's home *for nearly two hours*, during which time Defendants seized a number of patient files that Petitioner had brought home to review – none of which were for Defendants DiMiceli or "Orlando."

28.     Additionally, during this illegal search, Defendants seized $52,874.00 in U.S. currency from Petitioner, despite there being no evidence whatsoever tying this cash money to any alleged illegal activity, and despite the warrant's clear exclusion of cash money from the items authorized to be seized.

29.     Only after subjecting Petitioner and his wife to a two hour interrogation and search

of their home did Defendants, at approximately 10:00 a.m., finally execute their search warrant upon Petitioner's business office.

30.     Although Petitioner and his employees were present during Defendants' search of Petitioner's office, and although there were patients waiting to be seen, Defendants effectively declared the office closed for the day by telling the patients to leave, with no allowance for Petitioner to reschedule any appointments.

31.     With the office thus effectively closed, Defendants proceeded to search through Petitioner's business records and patient files from approximately 10:00 a.m. to 5:00 p.m., with the full cooperation of Petitioner and his employees, during which time Defendants seized *over one thousand original patient files* and all or nearly all of Petitioner's business records.  Notably, Defendants seized *original* documents without leaving any copies for Petitioner.

32.     During this time, one or more of the Defendants continued to verbally intimidate Petitioner by making remarks to the effect that Petitioner should surrender his CDS registration in order to avoid being formally cited with a violation of law.

33.     Only after Defendants had spent nearly *nine hours* searching Petitioner's home and office, continuously interrogating Petitioner throughout this time, and abusively drilling vague insinuations about license revocation, allegations of violations of law, and possession of firearms into Petitioner's mind all day, did Defendants present a Form DEA-104 Voluntary Surrender of Controlled Substances Privileges and a Consent Order of Temporary Suspension of N.J. CDS Registration for Petitioner to sign.

34.     Although Defendants were careful to tick the right boxes on these surrender forms to facially indicate that Petitioner voluntarily surrendered his Federal and State CDS registrations, nothing can be further from the truth.

35.     Indeed, after having his home raided, having every aspect of his personal and

professional life glaringly scrutinized by a dozen law enforcement officers, having been prevented from treating any patients all day, and having seen more than $50,000 in cash and more than one thousand patient files being carted away, Defendants, having placed Petitioner in a state of absolute terror and fear, put papers in front of Petitioner that, if only he would sign, his nine hour ordeal would finally be over.

36.    At no time did Defendants afford Petitioner any actual opportunity to read the papers thrust upon him, or to consult with an attorney, or explain to Petitioner the important legal rights he would be waiving by signing the papers.

37.    Given the circumstances surrounding Petitioner's encounter with Defendants, including their presenting to his home at or around 8:00 a.m. with a squadron of law enforcement vehicles, a dozen law enforcement officers exhibiting an overwhelming show of force, as well as their treatment of Petitioner and his family using abusive and deceptive practices, Defendants created circumstances that completely eviscerated Petitioner's civil liberties.

38.    While Defendants' actions in conducting their investigation and search are shocking and unconscionable, the DEA's responses to date to Petitioner's efforts to seek legal redress have been equally staggering.

39.    It is undisputed that the DEA's Order to Show Cause affords Petitioner the right to an administrative hearing to lift or modify the suspension of his CDS registration.  In fact, according to the Order to Show Cause, Petitioner's right to an administrative hearing is waived only if: Petitioner fails to timely request a hearing, fails to appear for a scheduled hearing, or "file[s] with the DEA a waiver of hearing together with a written statement regarding its respective positions on the matters of fact and law involved."

40.    It is further undisputed that Petitioner timely filed a request for such a hearing, in accordance with DEA regulations, and DEA Administrative Law Judge Christopher B. McNeil

initially granted Petitioner's request for and scheduled the hearing.

41.     Yet, instead of allowing Petitioner to exercise his right to a full and fair plenary hearing, the DEA seeks to use the DEA-104 form, which was exacted by duress and trickery, to deprive Petitioner of his rights.

42.     The DEA has taken the position that nothing in this case matters except for the fact that Petitioner signed a DEA-104 voluntary surrender form – in essence pretending as if the Order to Show Cause and Petitioner's hearing rights thereunder do not exist, and sweeping Defendants' improper search and seizure under the proverbial rug.

43.     Indeed, after Petitioner filed his request for a hearing on August 28, 2014, counsel for the DEA moved to dismiss the administrative proceeding on September 4, 2014, relying upon Petitioner's signed DEA-104 form, but citing no legal basis for why the DEA-104 voluntary surrender supersedes or obviates the Order to Show Cause, and Petitioner's hearing rights thereunder.

44.     Notably, the DEA-104 form makes no mention whatsoever that by signing the form, Petitioner would be waiving his hearing rights.

45.     Furthermore, the DEA-104 form is couched in language that deceptively implies that Petitioner's signature would be merely "an indication of my good faith" and desire to cooperate with law enforcement authorities, *not* that it would in actuality be held against him as a waiver of rights.

46.     Significantly, neither Petitioner nor Defendants check the box on the DEA-104 form that indicates "my [Petitioner's] desire to terminate handling of controlled substances," and thus Petitioner did not manifest any intent to permanently cease his professional use of CDS.

47.     Shockingly, while it is undisputed that Petitioner had until September 11, 2014 to respond to the DEA's motion to dismiss, the DEA Administrative Law Judge presiding over this case granted the motion *sua sponte* on September 8, 2014, a mere six business days after he granted

Petitioner's request for a hearing.

48.     Not only did the Administrative Law Judge's order similarly cite no legal basis for why the DEA-104 voluntary surrender supersedes or obviates the Order to Show Cause, and Petitioner's hearing rights thereunder, but also arbitrarily and capriciously cites no legal basis for denying Petitioner an opportunity to respond to such a dispositive motion as a motion to dismiss.

49.     On September 9, 2014, Petitioner promptly appealed the Administrative Law Judge's order by filing a motion to re-open administrative proceedings, citing, *inter alia,* the lack of opportunity to respond to the motion to dismiss, as well as the questions of material fact regarding the search warrant, the voluntariness of Petitioner's signing of the DEA-104 form, and the legal efficacy of the DEA-104 in effectuating a waiver of Petitioner's Constitutional rights.

50.     Just as with the issuance of the Order to Show Cause, the DEA's order denying Petitioner's appeal was issued by Defendant Harrigan, on September 25, 2014.

51.     Furthermore, just as with the DEA's prior positions in this case, Defendant Harrigan's final agency order relies entirely upon Petitioner's signing of the DEA-104 form, but nevertheless still cites no legal basis for why the DEA-104 voluntary surrender supersedes or obviates the Order to Show Cause, and Petitioner's hearing rights thereunder.

52.     More curiously, while Defendant Harrigan's order acknowledges that the Administrative Law Judge prematurely terminated the hearing proceedings, Defendant Harrigan arbitrarily and capriciously failed to consider that this undisputed breach of due process was significant enough by itself to warrant remanding the case for a hearing.

53.     Moreover, Defendant Harrigan's order arbitrarily and capriciously faulted Petitioner for failing to provide evidence of coercion in support of his contention that the DEA-104 form was not actually voluntarily signed, even though it was the DEA's own admittedly premature termination of administrative hearing proceedings that foreclosed Petitioner's ability to develop such evidence

through discovery.

54.     Indeed, entirely throughout this case, Petitioner has been unfairly hamstrung by a complete lack of basic due process – he has had his CDS registration summarily suspended, his home and office searched, and his property seized, all without having been shown one iota of evidence and without confronting a single witness, while the DEA is content to let the mere superficiality of procedural form ride roughshod over legal substance.

55.     Indeed, not only has the DEA slammed the door on Petitioner's CDS registration, but the DEA has also initiated a civil asset forfeiture proceeding against the $52,874.00 in U.S. currency improperly seized from Petitioner's home.

56.     Moreover, despite letters from Petitioner's counsel dated September 15 and 23, 2014, to the U.S. Attorney's Office and the DEA, seeking the return of Petitioner's *original* patient and business records, which are of paramount importance not only to Petitioner but also to his patients whose treatment depends on such records, to date none of these records have been returned even after the DEA has had two months to examine and/or copy them.

57.     Separate and apart from the suspension of Petitioner's CDS registration and the seizure of cash, Petitioner's continued inability to access his own business records, and the medical records necessary for him to treat his patients, has caused and continues to cause severe hardship and irreparable harm to Petitioner's medical practice, not to mention poses a significant risk to patient health, safety, and welfare.

58.     In their overzealous pursuit of any violation with which to charge Petitioner, Defendants have wantonly abused the color of legal authority, misrepresented the truth, engaged in trickery and coercion, and torn asunder the very Constitutional protections of due process that they are sworn to protect.

59.     Indeed, to date, Petitioner has not been charged with any crime and, to date, the

grounds for the suspension of Petitioner's CDS registration have not been substantiated in any court of law.

## THE PARTIES

60.     Petitioner is a citizen of the United States of America and of the State of New Jersey, and is a physician engaged in the solo practice of internal medicine.  At all times relevant to this Complaint, Petitioner has held license no. 25MA06054400 to practice medicine and surgery in the State of New Jersey, and has maintained a medical office located at 160 Haledon Avenue, Prospect Park, New Jersey 07508.

61.     Petitioner is an observant Muslim of Syrian descent, is married, has five children, and is not a native speaker of English.

62.     Petitioner's medical practice is mere yards away from the City of Paterson, New Jersey.  The City of Paterson has been designated by the New Jersey Department of Health as a Medically Underserved Area (ranking in the top six of the Medically Underserved Municipalities in New Jersey).  Due to his medical practice's proximity to the City of Paterson, the majority of Petitioner's patients are from the City of Paterson, with many such patients being uninsured or underinsured (e.g., recipients of Medicaid).  Petitioner has practiced out of this location since 1994.

63.     Petitioner's record is devoid of any legal or administrative infractions.

64.     At all times relevant to this Complaint, Petitioner has held registration no. BK4069969 from the United States Drug Enforcement Administration ("DEA"), authorizing him to administer, dispense, and prescribe controlled dangerous substances ("CDS") pursuant to the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 et seq., and the federal regulations thereunder, 21 C.F.R. §§ 1300.01 et seq.

65.     At all times relevant to this Complaint, Petitioner has held registration no. D06450600 from the Drug Control Unit of the New Jersey Division of Consumer Affairs,

authorizing him to administer, dispense, and prescribe CDS pursuant to the New Jersey Controlled Dangerous Substances Act, N.J.S.A. 24:21-1 et seq., and the state regulations thereunder, N.J.A.C. 13:45H-1.1 et seq.

66.     The Drug Enforcement Administration is an agency of the Federal Government of the United States of America, within the U.S. Department of Justice.

67.     Defendant, Thomas M. Harrigan, is the Deputy Administrator of the DEA, with the authority to issue final agency orders.  As such, he is an "agency head" within the meaning of the Administrative Procedure Act.

68.     Defendant, Adriana DiMiceli, is a Special Agent of the DEA.  As such, she is employed by the United States as a law enforcement officer.

69.     Defendant, Thomas Popowich, is a Diversion Investigator of the DEA.  As such, he is employed by the United States as a law enforcement officer.

70.     Defendant, Thomas Germany, is a Special Agent of the DEA.  As such, he is employed by the United States as a law enforcement officer.

71.     Defendants, John Does 1 – 20, are law enforcement officers who initiated, organized, implemented, supervised, or participated in the DEA's investigation of Petitioner, including but not limited to the search of Petitioner's home and/or office.

## JURISDICTION AND VENUE

72.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 since all causes of action in this Complaint arise under the Constitution, laws, and regulations of the United States.

73.     This Court has original jurisdiction to render judicial review of final administrative agency orders giving rise to this action pursuant to 5 U.S.C. § 702; and 21 C.F.R. § 1301.36.

74.     This Court has original jurisdiction over the civil rights claims in this action pursuant

to 42 U.S.C. § 1983.

75.     This Court has original jurisdiction over the civil asset forfeiture claims in this action pursuant to 18 U.S.C. §§ 981, 983, and 984; 21 U.S.C. § 881; 28 U.S.C. §§ 1346 and 1355; and Fed. R. Crim. Pro. 41.

76.     This Court has original jurisdiction over the replevin claims in this action pursuant to Fed. R. Civ. Pro. 64.

77.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395; and Fed. R. Crim. Pro. 41(g), as Petitioner resides in and has his principal place of business is in this District, the events giving rise to the claims herein occurred in this District, and the property subject to the claims herein was seized from and is found in this District.

### FACTS COMMON TO ALL COUNTS

78.     Petitioner repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

79.     Petitioner, Mohamed M. Kawam, M.D., is a New Jersey licensed physician who maintains a solo private practice at 160 Haledon Avenue, Prospect Park, New Jersey 07508.

80.     Pursuant to the Controlled Substances Act, physicians must obtain a certificate of registration from the DEA, via an administrative licensing procedure, in order to administer, dispense, and prescribe drugs listed as controlled substances (CDS).

81.     Pursuant to the New Jersey Controlled Dangerous Substances Act, physicians in New Jersey must also obtain a certificate of registration from the Drug Control Unit of the New Jersey Division of Consumer Affairs, via an administrative licensing procedure, in order to administer, dispense, and prescribe CDS.

82.     Federal and New Jersey state courts have long recognized that as a form of license, physicians maintain a property interest in their CDS certificates of registration, and thus due process

of law is required in order to restrict, suspend, or revoke a CDS registration.

83.     In the everyday practice of medicine and in the course of their professional practice, physicians who have duly obtained the appropriate federal and state CDS registrations may administer, dispense, and prescribe CDS to patients in accordance with their professional medical judgment, and as guided by the laws and regulations governing the practice of medicine, including but not limited to, the New Jersey Medical Practices Act ("MPA"), N.J.S.A. 45:9-1 et seq.

84.     Over the course of his twenty years of practicing medicine in New Jersey, Petitioner has never previously been the subject of any investigation concerning his prescribing of CDS.

85.     On the contrary, in accordance with best practices of the profession, Petitioner has always been conscientious about the need to closely monitor patients to whom he prescribes CDS, in order to guard against drug dependency, abuse, or illegal diversion.

86.     By way of example and not limitation, Petitioner's prescribing of CDS pain medication accounts for twenty percent (20%) or less of his overall prescribing, which is primarily prescribed to patients with documented disabilities or chronic conditions, or who are diagnosed with short term acute pain.

87.     By way of further example and not limitation, Petitioner regularly uses New Jersey's Prescription Monitoring Program ("PMP"), a state-mandated electronic database, to check if his patients are obtaining CDS from multiple physicians.

88.     By way of background, the PMP "is a statewide database that collects prescription data on Controlled Dangerous Substances (CDS) and Human Growth Hormone (HGH) dispensed in outpatient settings in New Jersey, and by out-of-state pharmacies dispensing into New Jersey. Pharmacies are required to submit this data weekly. […]  Access to the NJPMP is granted to prescribers and pharmacists who are licensed by the State of New Jersey and in good standing with their respective licensing boards. Before issuing a prescription or dispensing a prescribed drug,

qualified prescribers and pharmacists who have registered to use the NJPMP are able to access the NJPMP website and request the CDS and HGH prescription history of the patient. […]  Patient information in the NJPMP is intended to supplement an evaluation of a patient, confirm a patient's drug history, or document compliance with a therapeutic regimen."

89.     Upon information and belief, beginning in March 2014, Defendant DiMiceli, a DEA agent in an undercover capacity, posed as a patient seeking medical treatment from Petitioner.

90.     Upon information and belief, beginning in March 2014, at least one other DEA agent, in an undercover capacity, posed as a patient seeking medical treatment from Petitioner. While Petitioner is at this time without knowledge as to this agent's actual name, Petitioner rendered medical treatment to this agent as patient "William Orlando."  For the purposes of this Complaint, Petitioner includes "William Orlando" among Defendants John Does 1 – 20, subject to identification.

91.     Over the course of six to seven months, Defendants DiMiceli and "Orlando" made regular monthly office visits to Petitioner's medical office, purportedly seeking legitimate treatment for pain and/or other conditions.

92.     Upon information and belief, Defendants DiMiceli and "Orlando" gave Petitioner false medical histories and/or fabricated medical records, including, but not limited to, MRI reports, in support of their presenting conditions.

93.     Believing in good faith that the information provided by Defendants DiMiceli and "Orlando," and believing that Defendants DiMiceli's and Orlando's conditions constituted legitimate medical purposes for treatment, Petitioner, in the course of his professional practice, rendered legitimate medical treatment to both Defendants in accordance with the standards of professional medical practice, by *inter alia* performing physical examinations of both Defendants, and prescribing to both Defendants clinically appropriate, therapeutic dosages of medication, including

16

Oxycodone and Alprazolam.

94.     At no time during the course of treatment rendered by Petitioner to Defendant DiMiceli did Petitioner prescribe Oxycodone and Alprazolam outside of the course of his professional practice or in a manner that was without a legitimate medical purpose.

95.     At no time during the course of treatment rendered by Petitioner to Defendant "Orlando" did Petitioner prescribe Oxycodone and Alprazolam outside of the course of his professional practice or in a manner that was without a legitimate medical purpose.

96.     At no time during Petitioner's professional acquaintance with Defendants DiMiceli and "Orlando" did Petitioner solicit or accept any bribe, kickback, or other illegal remuneration in exchange for providing CDS or CDS prescriptions.

97.     In fact, during all of their office visits to Petitioner, neither Defendant DiMiceli nor Defendant "Orlando" presented any indication of drug dependency or drug seeking behavior.

98.     At no time during Petitioner's professional acquaintance with Defendants DiMiceli and "Orlando" did Petitioner give Defendants any indication that he examined patients, issued prescriptions, kept CDS, received payments from patients, or conducted any other activity related to the practice of medicine from his home.

99.     Nevertheless, Defendants proceeded to conduct their improper search and seizure of property from Petitioner's home and office, as described in this Complaint herein.

100.     At no time did Petitioner relinquish, voluntarily or otherwise, his property interests in his federal and state CDS registrations or any of the property seized by the DEA.

101.     To date, Petitioner has and continues to be deprived of his property without having had any meaningful opportunity to be heard, without having been presented with any charges of violations of law, without having had any opportunity to conduct discovery or examine the evidence against him, without having had any opportunity to interview witnesses or confront his accuser(s), or

otherwise meaningfully exercise the rights to due process to which he is entitled.

102.    Petitioner reserves and does not waive his right to file a Federal Tort Claims Act claim against Defendants arising from Defendants' conduct in this case.

103.    Subject to 28 U.S.C. § 2675, Petitioner reserves and does not waive his right to amend this Complaint in the event that his Federal Tort Claims Act claim is administratively denied.

**COUNT ONE**
**(Judicial Review of Agency Decision)**

104.    Petitioner repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

105.    Petitioner holds a CDS certificate of registration from the DEA, in which he has a recognized property right subject to due process of law.

106.    Defendant Harrigan is empowered by DEA regulations to issue an Order to Show Cause, with an immediate suspension of a CDS registration, pursuant to 21 C.F.R. § 1301.36(e), if he finds that there is an imminent danger to the public health or safety.

107.    There has been no showing by Defendants that Petitioner poses an imminent danger to the public health or safety.

108.    In fact, the recitation of facts set forth in the Order to Show Cause issued in this case is entirely devoid of any showing of competent evidence to indicate that Petitioner was illegally selling or indiscriminately prescribing CDS or CDS prescriptions.

109.    Defendant Harrigan was therefore without any legal or factual basis to invoke the "imminent danger" justification for issuing the Order to Show Cause with an immediate suspension of Petitioner's CDS registration.

110.    Nevertheless, upon issuance and service of the Order to Show Cause upon Petitioner, Petitioner has a due process right to seek a hearing to terminate or modify the suspension.

111.    Petitioner duly requested such a hearing in a timely manner as set forth under DEA regulations.

112.    Because the CDS suspension under the Order to Show Cause took immediate effect, Petitioner's CDS registration was already suspended by the time that Defendants conducted their search of his home and office.

113.    There was therefore no basis for Defendants to demand that Petitioner sign a Form DEA-104 Voluntary Surrender of Controlled Substances Privileges, as it would have been legally moot in light of the Order to Show Cause.

114.    Nevertheless, Defendants coerced Petitioner into signing the DEA-104 form.

115.    Notwithstanding any superficial checklists completed by Defendants to the contrary, Petitioner did not voluntarily, knowingly, or intelligibly sign the DEA-104 form and did not voluntarily surrender his CDS registration.

116.    The only possible justification for Defendants' demand that Petitioner additionally sign a DEA-104 form, even though legally his CDS registration had already been immediately suspended by operation of the Order to Show Cause, was to deprive Petitioner of an opportunity for a hearing to contest the suspension, in violation of due process.

117.    Petitioner's signed DEA-104 form is therefore legally void *ab initio* as being the product of undue law enforcement coercion and duress, the product of an egregious preemptive law enforcement effort to deprive Petitioner of his due process rights, and as being legally moot.

118.    In denying Petitioner the opportunity for a hearing on the suspension and the Order to Show Cause, the DEA set forth no legal basis for why the DEA-104 voluntary surrender should supersede or obviates the Order to Show Cause, and Petitioner's hearing rights thereunder.

119.    Indeed, according to the Order to Show Cause, Petitioner's right to an administrative hearing is waived only if: Petitioner fails to timely request a hearing, fails to appear for a scheduled

hearing, or "file[s] with the DEA a waiver of hearing together with a written statement regarding its respective positions on the matters of fact and law involved;" and it is undisputed that Petitioner did properly and timely request a hearing.

120.    While the DEA and Defendant Harrigan acknowledge that Petitioner's requested hearing proceedings were prematurely terminated, Defendant Harrigan arbitrarily and capriciously refused to reopen the hearing.

121.    Moreover, Defendant Harrigan's order arbitrarily and capriciously faulted Petitioner for failing to provide evidence of coercion in support of his contention that the DEA-104 form was not actually voluntarily, knowingly, or intelligibly signed, even though it was the DEA's own admittedly premature termination of administrative hearing proceedings that foreclosed Petitioner's ability to develop such evidence through discovery.

122.    Furthermore, notwithstanding the issue of discovery, Petitioner has legitimately raised the issue of coercion in light of both the length and circumstances of Petitioner's encounter with the DEA, and the DEA's lack of a valid warrant to search Petitioner's home.

123.    Indeed, entirely throughout this case, Petitioner has been unfairly hamstrung by a complete lack of basic due process – he has had his CDS registration summarily suspended, his home and office searched, and his property seized, all without having been shown one iota of evidence and without confronting a single witness, while the DEA is content to let the mere superficiality of procedural form ride roughshod over legal substance.

124.    Petitioner has therefore raised a genuine issue of material fact and a *sui generis* question of law, for which an administrative hearing would have been appropriate.

125.    However, separate and apart from the merits of Petitioner's substantive arguments, the DEA and Defendant Harrigan have and continue to deny Petitioner even the mere opportunity to be heard on these issues.

126.    Egregiously, Defendant Harrigan callously based his decision to deny a hearing in part because Petitioner was unable to make an evidentiary proffer, knowing full well that Petitioner has had no opportunity to conduct discovery and, indeed, has thus far been affirmatively deprived of potentially exculpatory evidence (i.e., Petitioner's business records and patient files).

127.    The actions of Defendant Harrigan in this case were arbitrary and capricious, and not founded whatsoever in law or fact.

**WHEREFORE**, Plaintiff-Petitioner, Mohamed M. Kawam, M.D., hereby demands judgment in his favor and against Defendant, United States of America, for injunctive relief, replevin, attorney's fees and costs, pre- and post-judgment interest, and for such other relief as the Court deems equitable, just and proper.

## COUNT TWO
### (Civil Rights – Search and Seizure)

128.    Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

129.    The Fourth Amendment to the U.S. Constitution protects citizens from unreasonable searches of their persons or property by agents of the United States Government.

130.    Defendants had no probable cause to search Petitioner's home.

131.    Although Defendants had a search warrant for Petitioner's business office, Defendants had no search warrant for Petitioner's home.

132.    Defendants entered and searched Petitioner's home under the misrepresentation and false pretense of having a search warrant, and by using coercive conduct under the color of their law enforcement authority.

133.    Defendants never produced a copy of their search warrant to Petitioner during the time that Defendants were conducting their search of Petitioner's home.

134.    Petitioner did not voluntarily consent to Defendants' search of his home.

135.    Neither Petitioner nor his wife voluntarily consented to being detained and interrogated in their home.

136.    As a result of the improper search of Petitioner's home, Defendants seized certain property from Petitioner, *inter alia* $52,874.00 in U.S. currency.

137.    Thus, Defendants' search of Petitioner's home was an action under color of law that caused Petitioner to be deprived of his rights and property.

138.    The actions of Defendants in searching Petitioner's home, and seizing property therefrom, were clear and egregious violations of the Fourth Amendment and 42 U.S.C. § 1983.

139.    As a result of improper search of Petitioner's home, Petitioner has suffered severe psychological distress, including but not limited to, anxiety, depression, and insomnia, that impairs his physical activities and personal life.

**WHEREFORE**, Plaintiff-Petitioner, Mohamed M. Kawam, M.D., hereby demands judgment in his favor and against Defendants-Respondents, United States of America, Thomas M. Harrigan, in his official capacity as Deputy Administrator of the Drug Enforcement Administration, Adriana DiMiceli, Special Agent – Drug Enforcement Administration, in her individual capacity, Thomas Popowich, Diversion Investigator – Drug Enforcement Administration, in his individual capacity, Thomas Germany, Special Agent – Drug Enforcement Administration, in his individual capacity, and John Does 1 – 20, law enforcement officers, in their individual capacities, for injunctive relief, damages, attorney's fees and costs, pre- and post-judgment interest, and for such other relief as the Court deems equitable, just and proper.

## COUNT THREE
### (Dispute of Civil Asset Forfeiture)

140.    Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

141.    The property subject to forfeiture is described by a DEA Notice of Seizure dated

September 9, 2014, Asset ID No. 14-DEA-602837, Case No. C3-13-0140, to wit: $52,874.00 in U.S. currency owned by Petitioner and seized from Petitioner's home.

142.    It is undisputed that Petitioner retains a property interest in the $52,874.00 in U.S. currency seized by the DEA, as the DEA Notice of Seizure acknowledges Petitioner as the property's owner

143.    It is undisputed that the subject U.S. currency was seized from Petitioner's home, as the DEA Notice of Seizure acknowledges the place of seizure as Wayne, New Jersey, where Petitioner's home is located.

144.    The subject U.S. currency was seized as a result of an illegal and improper search of Petitioner's home.

145.    There is no evidence to show that the subject U.S. currency was used or acquired as a result of any violation of the Controlled Substances Act or any other violation of law.

146.    The subject U.S. currency is in fact the product of significant savings by Petitioner and his family over a period of ten years, from which Petitioner and his family draws upon for household expenses, petty cash for Petitioner's medical practice, and emergency needs.

147.    Continued custody of the subject U.S. currency, or its fungible monetary equivalent, during the pendency of forfeiture proceedings therefore presents a severe and undue hardship upon Petitioner and his family.

148.    Seizure of the subject U.S. currency by the United States Government as a result of an illegal and improper search, with no evidentiary basis linking the property to any illegal activity, amounts to an illegal seizure of property in violation of the Fourth Amendment to the U.S. Constitution, and an illegal taking of property in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

**WHEREFORE**, Plaintiff-Petitioner, Mohamed M. Kawam, M.D., hereby demands

judgment in his favor and against Defendant, United States of America, for injunctive relief, replevin, attorney's fees and costs, pre- and post-judgment interest, and for such other relief as the Court deems equitable, just and proper.

## COUNT FOUR
### (Replevin of Documents and Files)

149.    Plaintiff-Petitioner repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

150.    Defendants recklessly and with deliberate indifference seized original business and patient medical records from Petitioner.

151.    Petitioner's books, records, files, and documents are irreplaceable, necessary to Petitioner's practice of medicine, and necessary to patient health, safety, and welfare.

152.    Petitioner retains a property right to his business records and patient files, and has a right to the return of all such records and documents seized.

153.    By improperly and unjustifiably delaying the return of these records, Defendants have caused undue hardship to Petitioner and Petitioner's patients, and have endangered patient health, safety, and welfare.

154.    As set forth in letters from Petitioner's counsel dated September 15 and 23, 2014, to the U.S. Attorney's Office and the DEA, these records are not only needed for continued patient treatment, but Petitioner has also received urgent requests for various patients' records for such ordinary purposes as physician referrals, disability claims, insurance payor claims and audits, and for use in patients' personal injury litigation.

155.    In fact, the letter dated September 23, 2014 from Petitioner's counsel to the U.S. Attorney's Office further stressed the urgency of the need to return these records, by enclosing a copy of a civil third party subpoena served upon Petitioner from a patient's attorney, in furtherance of that patient's personal injury litigation

156.    As a direct and proximate cause of Defendants' failure to return Petitioner's property, Petitioner is at risk of violating the New Jersey Medical Practices Act, breaching contractual and legal obligations to third parties, and being found in contempt of court

157.    The United States Government's continued custody of these records, which form the very essence of Petitioner's livelihood, amounts to an illegal taking of property in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

158.    The United States Government's continued custody of these records poses direct and irreparable harms to Petitioner's patients, who have for two months been effectively been deprived of their medical records, medications and prescription renewals, and access to treatment.

159.    As a direct and proximate cause of Defendants' failure to return Petitioner's property, Petitioner has been unable to effectively practice medicine and has seen a severe and irreparable decline in revenue.

160.    The United States Government's continued custody of these records therefore also threatens to destroy Petitioner's medical practice, causing irreparable economic harm to Petitioner and his employees.

**WHEREFORE**, Plaintiff-Petitioner, Mohamed M. Kawam, M.D., hereby demands judgment in his favor and against Defendants-Respondents, United States of America, Thomas M. Harrigan, in his official capacity as Deputy Administrator of the Drug Enforcement Administration, Adriana DiMiceli, Special Agent – Drug Enforcement Administration, in her individual capacity, Thomas Popowich, Diversion Investigator – Drug Enforcement Administration, in his individual capacity, Thomas Germany, Special Agent – Drug Enforcement Administration, in his individual capacity, and John Does 1 – 20, law enforcement officers, in their individual capacities, for injunctive relief, replevin, damages, attorney's fees and costs, pre- and post-judgment interest, and for such other relief as the Court deems equitable, just and proper.

### REQUEST FOR RELEASE OF SEIZED PROPERTY DUE TO HARDSHIP

Pursuant to 18 U.S.C. § 983(f), Petitioner hereby requests release of the seized property during the pendency of this proceeding due to hardship.

### JURY DEMAND

Plaintiff-Petitioner hereby demands a trial by jury on all issues so triable.

### DESIGNATION OF TRIAL COUNSEL

Plaintiff-Petitioner hereby designates Jonathan E. Levitt, Esq. as trial counsel in this matter.

### CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, the undersigned certifies that, to the best of his knowledge, the within matter in controversy is not the subject of any other action pending in any other court or any other pending arbitration. The within matter in controversy includes an appeal of an administrative proceeding held before the Drug Enforcement Administration, for which a final agency decision has been issued.

**FRIER & LEVITT, LLC**

By:    s/ Jonathan E. Levitt
          Jonathan E. Levitt, Esq. (JL 3881)
          William Lim, Esq. (WL 5706)
          84 Bloomfield Avenue
          Pine Brook, NJ 07058
          Telephone: (973) 618-1660
          Facsimile:   (973) 618-0650
          jlevitt@frierlevitt.com
          wlim@frierlevitt.com

          Attorneys for Plaintiff-Petitioner

Dated: October 13, 2014

## VERIFICATION

I, MOHAMED M. KAWAM, M.D., am the Plaintiff-Petitioner in the above-captioned action and have read the foregoing Verified Complaint. Based upon my personal knowledge, and as permitted by 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By:_____

MOHAMED M. KAWAM, M.D.

Dated: October 13, 2014